In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3852

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

OSYP FIRISHCHAK,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03-CV-9360—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED SEPTEMBER 28, 2006—DECIDED NOVEMBER 20, 2006

Before FLAUM, *Chief Judge,* and RIPPLE and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* In 1949, Osyp Firishchak filed an application for a visa to the United States under the Displaced Persons Act ("DPA"). In November 1954, he became a naturalized United States citizen. Several decades later, the Department of Justice uncovered documents suggesting that Firishchak served in the Ukrainian Auxiliary Police ("UAP") during World War II—a fact he did not disclose in his 1949 visa application. The discovery of these documents resulted in a trial, in which the district court ordered Firishchak denaturalized. Firishchak now appeals

the judgment of the trial court. For the following reasons, we affirm that judgment.

## I. BACKGROUND

In December 2003, the government filed a four-count complaint against Osyp Firishchak alleging that his citizenship was illegally procured and must be revoked according to § 340(a) of the Immigration and Naturalization Act of 1952, 8 U.S.C. § 1451(a) (2000). The government contended that Firishchak's admission into the United States was unlawful on several grounds: 1) he assisted in the persecution of civilians during World War II; 2) he participated in a movement hostile to the United States; 3) he willfully misrepresented his wartime activities throughout his visa application process; and 4) he advocated or acquiesced in acts contrary to human decency.

In August 2005, the district judge conducted a four-day bench trial and granted judgment for the government on all four counts. *United States v. Firishchak*, 426 F. Supp. 2d 780 (N.D. Ill. 2005). The primary issue at trial was whether Firishchak had served in the UAP. The government offered documentary evidence linking Firishchak to the UAP, expert testimony from a World War II historian, and testimony about post-war visa application procedures, while Firishchak testified in his own defense, denying any involvement with the UAP. Instead, he testified that he drifted from place to place during the war, hiding from the Nazis in various coffee shops. The district court found Firishchak's account of his war-time activities "incredible" and concluded that he had served in the UAP.

## A. Firishchak's Background Information

Osyp Firishchak was born on April 18, 1919 in Trebuszany, a town that became a part of Czechoslovakia

after World War I and is now a part of Ukraine. No other persons bearing his name were born in Trebuszany on that date. His father was named Hryts Firishchak.

In his application under the DPA, Firishchak described his employment and residences from 1941 to 1944, stating that he had worked as a laborer for a factory in Nitra, Slovakia, from 1939 to December 1941; a Ukrainian cooperative in "Lwow" (L'viv), Poland, from December 1941 to April 1944; and a building firm in Nitra, Slovakia, from April to October 1944. On his visa application, Firishchak described his residences from 1941 to 1944 as Nitra, Slovakia (1939 to December 1941); Lemberg (L'viv), Poland (December 1941 to April 1944); and Nitra, Slovakia (April 1944 to October 1944). Firishchak swore to the truth of the information on his visa application. He was admitted to the United States and later became a naturalized United States citizen.

**B.  The Ukrainian Auxiliary Police and World War II**

In August 1941, following Nazi Germany's June 1941 invasion of then-Soviet territory, German authorities formed the UAP to aid in policing the newly-incorporated District Galicia. Throughout its existence, the UAP was financed, directed, and controlled by German authorities. Ukrainian Auxiliary policemen in the city of L'viv were uniformed, armed, salaried, and received various benefits, including leave and preferential access to scarce commodities.

The Nazi policy toward Jews in District Galicia had several components. First, the Nazis issued new identification papers to Jews that identified their religion, and oversaw their confinement in ghettos. Later, many of these Jews were forcibly removed and killed. The Nazis temporarily spared a limited number of Jews, whom the Germans considered "work capable," transferring them to forced labor

camps where many died from starvation, disease, and other inhumane conditions. These measures were implemented and enforced from 1941 to 1943 in Galicia. During this time, the UAP checked personal identification documents and arrested Jews who lacked special work passes. They also arrested any Jew who failed to wear an armband bearing the Star of David.

At the time that Firishchak was admitted into the United States, the UAP was not on the Inimical List of organizations hostile to the United States—a list maintained by the Displaced Persons Commission to assist with processing visa applications.

## C. Stipulations and Evidence Presented at Trial

The parties stipulated to numerous facts and legal conclusions in the pre-trial order that greatly reduced Firishchak's available defenses at trial. They stipulated, among other things, that the UAP "enforced Nazi persecutory measures against . . . Jews in the city," by checking personal identification documents and arresting Jews for various violations and that the UAP assisted the Nazis with the largest ghetto reduction action in L'viv, commonly known as the "Great Operation." Pre-trial Order at 5-6.

As for legal conclusions, they stipulated if Firishchak "performed the routine duties of a Ukrainian Auxiliary policeman, he assisted in the persecution of civil populations." *Id.* at 16. Moreover, the parties stipulated that if Firishchak served in the UAP during WWII, he "was a member of, or participated in, a hostile movement." *Id.* at 18. In addition, the parties agreed that Firishchak's wartime activities, and UAP membership in particular, "were material facts" and that if he actually served in the UAP during WWII, "he made a willful and material misrepresentation of his wartime activities for the purpose of gaining admission to the United States." *Id.* at 19. Finally,

the parties stipulated that if Firishchak served in the UAP, "which was subordinate to the Nazi security authorities and routinely assisted in implementing a range of Nazi anti-Jewish policies, he advocated or acquiesced in activities or conduct contrary to civilization and human decency." *Id.* at 20. The end result of these stipulations was that Firishchak could only be absolved if the government failed to prove his membership in the UAP altogether.

At trial, the government introduced twenty-one wartime documents related to Firishchak's UAP service, including seven that bear his signature.[1] Two of those documents identify Firishchak by name and birth date and state that he had been employed by the 1st Commissariat of the Ukrainian Police since October 1941. One of the documents lists the headquarters of the 1st Commissariat as Firishchak's residence and lists his father's name as Hryts. The signatures on the documents are spelled the same, and all of the documents identify Firishchak as a police private in the UAP.  A few of the documents lacked specific dates.

During Firishchak's trial, Dr. Dieter Pohl, a scholar who has done extensive archival research on the Nazi occupation of District Galicia and the UAP, testified generally about the German occupation of Galicia and the role of the UAP in implementing Nazi policy. In addition, Pohl testified that there was no suspicion regarding the authenticity of the twenty-one wartime documents and that they were all housed in a location where one would expected to find them—the L'viv State Regional Archive. He further testified that all of the documents dated from 1942 to 1944.

---

[1]  During a sworn interview in 2003, Firishchak was shown a page with eight Ukrainian-language Cyrillic signatures taken from various exhibits, and he identified seven of them as his own. At the time he identified the signatures, he did not know that they came from documents related to the UAP. Later, he claimed he did not understand the question he was being asked when he identified the signatures as his own.

Robert Groner, a former Department of Justice trial attorney, testified regarding Firishchak's sworn interview, in which Firishchak identified seven signature samples (extracted from relevant UAP documents) as his own. Groner stated that Firishchak declined the services of an interpreter at the interview and was composed, lucid, and responsive until he was shown the documents regarding his UAP service, at which point he became nervous and agitated.

The government also offered testimony from William Weiss, a survivor of the L'viv Jewish ghetto. He did not specifically testify about Firishchak or identify him as a member of the UAP. Instead, Weiss testified about ghetto conditions as well as the abuse that occurred at the hands of both the Nazis and the UAP. Finally, the government entered the *de bene esse* depositions—depositions taken for use in the event of a witness's absence at trial—of Mario DeCapua and Everett Coe, who testified generally about visa applications and procedures under the DPA, including security investigations into applicants' backgrounds. No one with personal knowledge testified that Firishchak was a member of the UAP or performed the duties of a Ukrainian Auxiliary policeman in the streets of L'viv during World War II.

Firishchak testified in his own defense at trial, denying any service in the UAP. He admitted that the individual identified in the incriminating documents had the same name, the same birth date, the same father's name, and came from the same village. Firishchak admitted that he resided in the same town during the war as the individual identified in the wartime documents. As to his wartime activities, Firishchak testified that he was homeless throughout the war and drifted from place to place, hiding out in coffee shops along the way. He testified that after leaving his factory job in Germany, he went with little money and without proper travel documents from town to town, en route to a town whose name he did not know, to go

to school. He picked up occasional odd jobs along the way. The government highlighted various inconsistencies in Firishchak's story. For example, he stated that he never slept in the same place and was always on the move, but later acknowledged that he had an address in L'viv for an extended period of time.

The district court found the government's witnesses credible, but questioned both the substance of Firishchak's testimony and his mannerisms on the stand. Taking the stipulations, the admitted documents, the admitted depositions, and the live testimony altogether, the district court ruled against Firishchak on all four counts of the complaint.

## II. DISCUSSION

Firishchak raises a number of issues on appeal. First, he contends that the wartime documents evidencing his UAP service were inadmissible. Second, he argues that the district court abused its discretion by permitting Dr. Pohl to testify on a subject that was not disclosed in his pre-trial expert report. Third, Firishchak claims that the district court should have granted him a continuance because the government took two *de bene esse* depositions after the close of discovery. Fourth, Firishchak challenges the sufficiency of the evidence against him. Finally, he argues that he was denied a fair trial.

## A. Admissibility of the Wartime Documents

As a threshold matter, Firishchak disputes the admissibility of the wartime documents, arguing that they were improperly authenticated as ancient documents or business records and that they constitute inadmissible hearsay. This Court reviews a district court's determination regarding the admissibility of documents for an abuse of discretion. *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 722 (7th Cir. 2003).

Documents are authenticated by evidence "sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a); *Chemetall*, 320 F.3d at 722. Federal Rule of Evidence 901(b)(8) identifies the means by which "ancient documents" are authenticated. An ancient document should be (A) in such condition as to create no suspicion concerning its authenticity; (B) in a place where it, if authentic, would likely be; and (C) in existence twenty years or more at the time it is offered. Fed. R. Evid. 901(b)(8); *United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986). Whether the documents correctly identify the defendant goes to their weight and is a matter for the trier of fact; it is not relevant to the threshold determination of admissibility. *See Kairys*, 782 F.2d at 1379 (affirming the admission of wartime document).

In this case, Dr. Pohl, an expert who has done extensive archival research on the District Galicia, testified that there was no suspicion regarding the documents' authenticity and that they were housed in a state regional archive where one would expect to find such documents. He also testified regarding the age of the documents, stating that each document dated from between 1942 and 1944.

Firishchak correctly notes that mere recitation of the contents of documents does not authenticate them or provide for their admissibility, *United States v. Wittje*, 333 F. Supp. 2d 737, 743 (N.D. Ill. 2004), but Dr. Pohl's testimony was more than a mere recitation. Rather, he spoke of how historians relied on the documents and where they could be found in addition to their contents. Furthermore, Firishchak's identification of his own signature on seven of the documents suggests that they are authentic.[2]

---

[2] The government correctly asserts that many of the documents in question qualified as either self-authenticating foreign public documents or admissible certified copies. *See* Fed. R. Evid. 902(3);

(continued...)

Firishchak particularly questions the authentication of those documents that lacked specific dates. While it is true that several of the documents bear no specific date, their age can be proven by other means. For example, the appearance of the proffered evidence or even the contents of the material itself together with the surrounding circumstances can be used to determine a document's age. *See* Fed. R. Evid. 901(b)(4). In addition, all but one of the documents contain information—either month and year or season and year—which permits their age to be determined. Finally, Firishchak did not cite any particular characteristics of the documents that raise doubts regarding their authenticity. Considering Dr. Pohl's testimony in addition to the contents, location, and appearance of the documents themselves, the district court could reasonably determine the threshold question of the documents' authenticity. Therefore, the district court's decision to admit the wartime documents was not an abuse of discretion.

Firishchak also argues that the wartime documents were not admissible business records. This argument misses the point because the ancient documents rule and the business records exception are independent grounds for determining admissibility. *Compare* Fed. R. Evid. 803(6) *with* Fed. R. Evid. 901(b)(8); *see also, e.g., George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990). Because the documents in question were admissible under the ancient documents rule, whether they were kept in the ordinary course of UAP business is irrelevant. Finally, Firishchak's assertion that the documents constitute inadmissible hearsay is without merit. Under Federal Rule of Evidence 803(16), statements contained in authenticated ancient documents are not hearsay.

---

[2] (...continued)
Fed. R. Evid. 902(4). Firishchak did not object to these grounds for admissibility.

**B. Pre-trial Discovery Issues**

Firishchak has two complaints regarding the pre-trial discovery phase. First, he asserts that the government failed to disclose certain expert testimony in its required pre-trial report. Second, he believes that the taking of two *de bene esse* depositions after the close of discovery entitled him to a continuance. We review a district court's discovery rulings for an abuse of discretion. *Sims v. GC Servs. L.P.*, 445 F.3d 959, 963 (7th Cir. 2006).

Firishchak contends that the government did not disclose in its pre-trial expert report that Dr. Pohl would testify regarding the authenticity of the wartime documents. As a result, Firishchak argues, any such testimony should have been excluded as a sanction for violating Federal Rule of Civil Procedure 26(a)(2)(B), which requires expert reports to "contain a complete statement of all opinions to be expressed and the basis and the reasons therefore." Firishchak asserts that Dr. Pohl's report did not disclose any opinions regarding the authenticity of the wartime documents. The government, on the other hand, argues that Firishchak waived this claim because he did not object to "Dr. Pohl's qualification as an expert on the UAP *and documents relating thereto*, thereby acknowledging Dr. Pohl's ability to authenticate UAP documents." Gov. Br. at 44 (emphasis in original). Even if the claim was not waived, Firishchak cannot prevail. Dr. Pohl's 148-page expert report discussed each historical exhibit that was subsequently introduced at trial, including its archival source and locator information. The report also contained passages about where the historical documents are kept and how historians rely on them. Therefore, the district court did not abuse its discretion by permitting Dr. Pohl to testify regarding the authenticity of the documents.

Firishchak also takes issue with the fact that the government took two *de bene esse* depositions in the week leading

up to trial. Pursuant to a court order, all discovery in the case closed on March 11, 2005 and trial was scheduled to begin on August 1. According to Firishchak, on May 11, the government sent notice to the defendant of its intention to take the *de bene esse* depositions of Mario DeCapua and Everett Coe in July—less than 30 days prior to the trial date. Firishchak then filed a motion for a continuance, but his motion was denied. The government took Mario DeCapua's deposition on July 20 and Everett Coe's deposition on July 26.

The record reflects that more than ten weeks before trial, the government notified Firishchak that it would be taking videotaped *de bene esse* depositions of two elderly witnesses pursuant to Federal Rule of Civil Procedure 32(a)(3)(C), which permits the use of depositions "for any purpose" if the court finds a witness is unable to attend or testify because of age. Because the rule permits broad use of depositions in these circumstances, the court's decision not to grant Firishchak a continuance due to a permitted use was not an abuse of discretion. *See United States v. Egwaoje*, 335 F.3d 579, 587-88 (7th Cir. 2003) (noting that district courts have broad discretion to grant or deny continuances).

## C.  Sufficiency of the Evidence

Firishchak next argues that the evidence was insufficient to support the district court's findings. Because the right to acquire American citizenship is a precious one, the government carries a heavy burden of proof when attempting to divest a naturalized citizen of his citizenship. *Fedorenko v. United States*, 449 U.S. 490, 505 (1981); *Naujalis v. INS*, 240 F.3d 642, 646 (7th Cir. 2001). The evidence justifying revocation of citizenship must be clear, unequivocal and convincing, not leaving the issue in doubt. *Fedorenko*, 449 U.S. at 505. Even though the government's burden at trial is heavy, this Court reviews the trial court's findings of fact

under a deferential clearly erroneous standard. *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004). We review the district court's legal conclusions de novo. *Id.* In this case, the district court derived many of its findings of fact and conclusions of law from pre-trial stipulations. Ordinarily, stipulations of fact will obviate the need for appellate review of factual findings. *TMF Tool Co. v. Siebengartner*, 899 F.2d 584, 588 (7th Cir. 1990). This Court will, however, review findings derived from stipulated facts for clear error. *Id.* In other words, where the district court adopts a stipulated fact wholesale, it is binding on the parties and thus waived, but where the court makes inferences or derives factual findings from other stipulated facts, the clear error standard of review applies.

### 1. Membership in UAP

As mentioned above, whether Firishchak was a member of the Ukrainian Auxiliary Police is the linchpin of this case because he stipulated to nearly all other relevant facts. Firishchak contends that the government failed to prove his membership in the UAP by clear and convincing evidence. Firishchak's argument relies heavily on two facts: 1) that he denied UAP membership at all relevant times and 2) that the government produced no evidence from anyone with personal knowledge that Firishchak performed the duties of the UAP. The United States argues that testimony from people with personal knowledge is unnecessary, and cites cases in which citizens were denaturalized based on documentary evidence. *See, e.g.*, *United States v. Tittjung*, 753 F. Supp. 251 (E.D. Wis. 1990); *United States v. Baumann*, 764 F. Supp. 1335 (E.D. Wis. 1991).

Without deciding whether documentary evidence alone is enough to revoke citizenship, we note that the district court based its decision on more than the twenty-one wartime documents. In addition to those documents, the district court based its findings on Firishchak's own testimony and

admissions. Firishchak identified seven signatures from UAP documents as his own, and the district court's credibility determination that Firishchak was lying on the stand permitted it to conclude that the documents linking Firishchak to UAP service were accurate. Consequently, the evidence demonstrating Firishchak's UAP membership was sufficient to support the trial court's factual finding.

### 2. Count One—Assistance in Persecution

Firishchak next questions the district court's conclusion that he assisted in the persecution of civil populations, which would have rendered him ineligible for a visa under § 2(b) of the DPA. Because of numerous pre-trial stipulations, which he did not mention in his brief, Firishchak is bound by the facts leading to the trial court's conclusion. *See, e.g.*, *United States v. Flores-Sandoval*, 94 F.3d 346, 349 (7th Cir. 1996) (stipulating to conduct waives any claim that a defendant has not engaged in that conduct); *Soo Line R.R. v. St. Louis Sw. Ry.*, 125 F.3d 481, 483 (7th Cir. 1997) (stipulations are binding upon the party making them). Firishchak stipulated, for one, that the UAP enforced "persecutory measures against Jews." Pre-trial Order at 5. He also stipulated that the UAP assisted in checking the identification of Jews and arresting them for violating various rules. *Id.* In fact, Firishchak specifically stipulated that if he performed the routine duties of a Ukrainian Auxiliary policeman, he assisted in the persecution of civil populations.

Although we are not bound by stipulations to legal conclusions, *Saviano v. Comm'r of Internal Revenue*, 765 F.2d 643, 645 (7th Cir. 1985), in determining whether conduct amounted to assistance in persecution, the district court's application of the law to the facts of the case is reviewed deferentially. *See United States v. Mankiewicz*, 122 F.3d 399, 403 n.1 (7th Cir. 1997). The district court

relied on the pre-trial stipulations and Dr. Pohl's testimony regarding the role of the UAP in the District Galicia to conclude that Firishchak assisted in persecution. This conclusion was within the court's discretion since it had already found that Firishchak was a member of the UAP and that finding was not erroneous.

Firishchak also claims that the DPA requires evidence that he committed a particular atrocity or persecutory act in order to render him ineligible for a visa. However, personal involvement in atrocities need not be proven. *See, e.g.*, *Fedorenko*, 449 U.S. at 510 n.32; *United States v. Ciurinskas*, 148 F.3d 729, 734 (7th Cir. 1998). Firishchak's attempt to distinguish these cases by pointing out immaterial factual differences is unconvincing. Moreover, his own pre-trial stipulations waive any argument that specific acts need to be proven. *NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 892 (7th Cir. 1990) (noting that a party's stipulation can waive legal arguments).

### 3. Count Two—Service in a Movement Hostile to the U.S.

Firishchak next contends that the government failed to prove that he served in a movement hostile to the United States, which would render him ineligible for a visa under § 13 of the DPA. Again, Firishchak stipulated to this legal conclusion, so he waived the issue. *P\*I\*E Nationwide*, 894 F.2d at 892. Even if the argument had not been waived, courts considering the issue have held that service in a Nazi-sponsored police unit constitutes membership in a hostile movement under the DPA. *United States v. Kowalchuk*, 773 F.2d 488 (3d Cir. 1985) (holding that UAP service amounts to membership in a hostile movement); *United States v. Koziy*, 540 F. Supp. 25, 34 (S.D. Fla. 1982) (same); *United States v. Osidach*, 513 F. Supp. 51 (E.D. Pa. 1981) (same).

Firishchak relies on *United States v. Kwoczak*, 210 F. Supp. 2d 638, 652-53 (E.D. Pa. 2002), to argue that his UAP membership did not disqualify him under the DPA because the UAP was not named in a list of organizations considered hostile under the DPA (the "Inimical List"). Although *Kwoczak* initially held that ineligibility under § 13 of the DPA was limited to members of groups on the Inimical List, the court issued an amended opinion holding that inclusion on the list was not a prerequisite to disqualification. *United States v. Kwoczak* , No. Civ.A. 97-5632 , 2002 WL 32137688, at *2-3 (E.D. Pa. 2002). Moreover, Mario DeCapua, former head of the Displaced Persons Commission Security Investigations Division, testified that the Inimical List was not exhaustive, and membership in an organization that did not appear on the list could be disqualifying under the DPA, depending on the nature of the group's activities. Given the trial court's findings regarding the activities of the UAP, its conclusion that Firishchak participated in an organization hostile to the United States was proper.

### 4. Count Three—Misrepresentation of Material Facts

Firishchak next argues that the government failed to prove that he willfully misrepresented material facts in order to gain admission into the United States. Such misrepresentations would render him ineligible for admission under § 10 of the DPA. Again, this argument was waived. *P\*I\*E Nationwide*, 894 F.2d at 892. The parties stipulated that Firishchak's wartime activities, including his alleged membership in the UAP, were material facts, and the trial court agreed. A misrepresentation is material under the DPA if it has a natural tendency to affect the decision of the Displaced Persons Commission regarding visa eligibility. *See Kungys v. United States,* 485 U.S. 759, 770 (1988).

Even if this argument were not waived, Firishchak could not prevail. In his visa application, Firishchak told immigration officials that he was a laborer for a Ukrainian cooperative in L'viv from December 1941 to April 1944. However, the trial court found that he was serving in the UAP during this time. This inconsistency demonstrates that Firishchak misrepresented his wartime activities, and the truth would have influenced his visa eligibility. Though Firishchak suggests that UAP service is not a material fact, two trial witnesses testified to the contrary. First, Everett Coe, the vice consul who processed Firishchak's visa application, stated that he would not have issued Firishchak a visa had Firishchak truthfully disclosed his wartime activities. Second, Mario DeCapua testified that the Commission routinely rejected the applications of persons known to have served in Nazi-directed police forces. Given these facts, the district court properly concluded that Firishchak made material misrepresentations during the visa application process.

### 5. Count Four—Conduct Contrary to Human Decency

Finally, Firishchak contends that the government failed to prove that he advocated or acquiesced in activities or conduct contrary to civilization and human decency on behalf of the Axis countries during WWII. Such conduct would have rendered him ineligible for a visa under state department regulations at the time of his application. 22 C.F.R. § 53.33(j) (1949). Again, this argument is subject to the same waiver analysis, given that Firishchak stipulated that UAP service constituted conduct contrary to civilization and human decency. *P*I*E Nationwide*, 894 F.2d at 892. Further, given the facts established at trial, the district court properly concluded that Firishchak's UAP service constituted conduct contrary to human decency.

**D.  Fair Trial Claim**

Firishchak also claims that he was denied a fair trial. Firishchak describes the judge's comments on his demeanor and mannerisms as completely unprofessional. The district court opinion stated that "Firishchak's demeanor and mannerisms clearly showed that he was lying under oath on the stand," and the judge described Firishchak's "shameless attempt to excuse himself from an inexcusable act" as "cowardly." *Firishchak*, 426 F. Supp. 2d at 784. Although the district court's language may appear stern, the government correctly states that "it is the *job* of any factfinder to assess a witnesses' credibility." Gov. Br. at 49 (emphasis in original); *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

Firishchak continues with what the government labels "a hodgepodge of unsupported accusations and grievances," Gov. Br. at 49, but fails to cite any authority for his complaints. He complains that he did not receive a jury trial, he could not substitute a new judge, and his case was assigned to "a career government attorney with experience only in representing the government." Firishchak Br. at 50-51. Additionally, he argues that his trial was unfair because the trial judge reminded the government to admit its exhibits into evidence. *Id.*

Firishchak's independent "fair trial" claims were not preserved because he did not raise these issues at trial. *United States v. Walker*, 9 F.3d 1245, 1249 (7th Cir. 1993). As a result, this Court can only reverse if the district court committed plain error. *Id.* A plain error is one that is so obvious, crucial, and egregious that we should correct it despite the absence of an objection below. *See Backwater, Inc. v. Penn-American Ins. Co.*, 448 F.3d 962, 965 (7th Cir. 2006). Although it is unclear whether plain error review is available in appeals from denaturalization trials, we decline to decide this issue, because the result is the same if

forfeiture precludes review altogether or if the decision below is reviewed for plain error. Assuming, *arguendo*, that plain error review applies, Firishchak has not established that any of his unsubstantiated grievances amount to a showing of plain error. Because denaturalization proceedings are considered equitable rather than criminal, defendants in those proceedings are entitled to neither a jury trial nor a substitution of judge. Moreover, like all cases in the district court, Firishchak's case was randomly assigned to a judge who is duty-bound to act impartially, and Firishchak has offered no evidence that the district judge neglected that duty. As a result, Firishchak's claim that he was denied a fair trial cannot succeed.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

A true Copy:

        Teste:

                              _____
                              *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*