In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1889

MOHAMED ABDUL MATHIN,

*Plaintiff-Appellant,*

*v.*

JOHN F. KERRY, Secretary of State,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-05157— **Joan Humphrey Lefkow**, *Judge.*

ARGUED NOVEMBER 13, 2014 — DECIDED APRIL 7, 2015

Before POSNER, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Mohamed Abdul Mathin claims that
he was born in the United States but his request for a United
States passport was denied by the State Department after an
investigation into his claim of citizenship. He then filed an
action in district court under 8 U.S.C. § 1503(a) and 28 U.S.C.
§ 2201(a) seeking a declaration that he is a United States
national for the purpose of obtaining a United States passport.

After a trial on the matter, the district court denied his request for declaratory relief, holding that Mathin had failed to establish that he was a United States national. Mathin now appeals that determination to this court.

Pursuant to 8 U.S.C. § 1503, any person who claims a right or privilege as a national of the United States and is denied such right or privilege can institute an action for a judgment declaring him to be a national of the United States. Section 1503 authorizes a *de novo* determination by the district court of the status of the plaintiff as a United States citizen or national. *Hizam v. Kerry*, 747 F.3d 102, 108 (2nd Cir. 2014). Because the Government has a "strong and legitimate interest in ensuring that only qualified persons are granted citizenship," the Supreme Court has recognized that "doubts 'should be resolved in favor of the United States.'" *Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 637 (1967); *Bustamante-Barrera v. Gonzalez*, 447 F.3d 388, 394-95 (5th Cir. 2006).

Mathin's action for a declaration of United States nationality is premised on the claim that his Indian-citizen parents, Mohamed Ziaudeen ("Ziaudeen") and Asiaumma Abdul Majid ("Asiaumma"), traveled to the United States for business while his mother was 8 months pregnant with him, and that he was born prematurely in Chicago on September 23, 1965. The issue, then, is whether the district court erred in determining that Mathin had produced insufficient evidence that he was born in the United States. In this appeal following the bench trial, we review findings of fact for clear error and issues of law *de novo*. *Cohen Development Co. v. JMJ Properties, Inc.*, 317 F.3d 729, 735 (7th Cir. 2003). We will consider a fact

finding to be clearly erroneous only if, after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake has been committed. *Id.; Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (2014).

## I.

Mathin maintains that his parents had traveled to the United States and were staying at the home of a friend, Thomas Nielsen, in Chicago, Illinois, when Mathin was born in that home on September 25, 1965. According to Mathin, a midwife, Margaret Roper, was present at the birth, as well as the midwife's 17-year-old niece Judith Roper ("Roper"), Thomas Nielsen ("Nielsen"), and Nielsen's mother Ina Nielsen, along with Mathin's mother and father. Of those individuals, only Mathin's father was still living at the time of the district court trial. Mathin further stated that after his birth, he was taken to Norwegian American Hospital for examination.

There are no contemporaneous records available supporting those events. No birth certificate was filed by his parents, the midwife, or the hospital. Mathin was unable to provide any records from Norwegian American Hospital indicating that he was examined there. Mathin testified that he tried to obtain such hospital records but that the hospital had experienced a flood and fire and his records could not be located. He did not provide any evidence from the hospital confirming that records from that time period had been destroyed, or that it had suffered a flood and fire. Furthermore, although the State Department attempted to verify the trip through the visa or passport records, it was unable to find any record of the trip.

Mathin testified that approximately a month after his birth, his mother returned to India with him. He maintained that he traveled on his mother's passport at that time, and that he continued to travel on his mother's Indian passport until his mother's death when he was 13 years old. At that time, his father obtained an Indian passport for him, which identified India as Mathin's place of birth.

Mathin traveled to the United States numerous times using his Indian passport during the 1990s. He resides in Florida with his wife and two children, all of whom are United States citizens. He applied for United States passports for his children in 1993 and 1995. Each time, he represented that he was born in India. The district court found credible Mathin's testimony that he represented his birthplace as India on the advice of his attorney because of his Indian passport.

Mathin applied for a delayed birth certificate with the State of Illinois in 1996, which was also the year that his five-year visa was set to expire leaving him without immigration status. The Illinois Department of Public Health issued him that delayed birth certificate based on two documents submitted by Mathin – an affidavit from Judith Roper attesting that he was born in Chicago, and his 1988 marriage certificate translated into English which listed his birthplace as the United States. In 1996, 2007 and 2010, Mathin applied for a United States passport. He submitted the delayed birth certificate and the underlying documents in support of his 1996 passport application, which was denied. Mathin applied for a passport again in 2007, and in this application he included affidavits purportedly created by his parents in 1966 regarding the circumstances of his birth. Mathin also included a 2007 letter

from a lawyer in India named S. Krishnamurthy indicating that he found the affidavits from Mathin's parents after conducting a search of his warehouse. Mathin subsequently withdrew that 2007 passport application. Finally, Mathin submitted another passport application in 2010 which the State Department denied after an investigation.

Mathin brings this action under 8 U.S.C. § 1503(a) which allows anyone who claims a right or privilege as a national of the United States that has been denied to seek a judgment declaring him to be a national of the United States. Pursuant to 22 C.F.R. § 51.40, Mathin has the burden of demonstrating his citizenship by a preponderance of the evidence.

Mathin acknowledges that the burden of proving citizenship rests with him, and that the primary form of documentary evidence to meet that burden is a contemporaneous official birth certificate, which Mathin lacks. See 22 C.F.R. § 51.42(a). He properly contends, however, that the absence of contemporaneous official birth records is not dispositive, and that secondary evidence can establish his birthplace. Such evidence may include, but is not limited to, "hospital birth certificates, baptismal certificates, medical and school records, certificates of circumcision, other documentary evidence created shortly after birth but generally not more than 5 years after birth, and/or affidavits of persons having personal knowledge of the facts of the birth." 22 C.F.R. § 51.42(b).

In addition to his own testimony, Mathin sought to meet that burden by introducing exhibits including: the delayed record of birth issued by the State of Illinois stating that he was

born in Chicago; the affidavits purportedly prepared in 1966 by Mathin's mother and father attesting that he was born in Chicago; an affidavit purportedly by Thomas Nielsen addressed to the Consulate General of India in New York and dated October 15, 1965, stating that Mathin was born in his home in Chicago; and videotaped deposition testimony of his father corroborating that he was born in Nielsen's home in Chicago.

The district court considered all of that evidence and Mathin's testimony, and determined that Mathin had failed to meet his burden of establishing by a preponderance of the evidence that he was born in Chicago and therefore was a United States citizen.

## II.

Mathin raises a number of challenges to that determination on appeal. First, Mathin argues that the district court erred in the probative weight that it gave to the evidence. Specifically, he asserts that the delayed birth certificate granted by the State of Illinois should have been given more weight by the court and regarded as primary evidence that he was born in the United States. He further asserts that his testimony and the deposition testimony of his father should have been accorded more weight by the court, and that the affidavits attesting to his birth were admissible as exceptions to the hearsay rule and should have been given significant probative weight. Finally, he argues that the Investigative Management System Report of Investigation ("IMS Report") from the Diplomatic Security Service of the Department of State ("DSS"), proffered by the

government at trial, constituted inadmissible hearsay and should not have been considered.

We need not address Mathin's repeated arguments that the affidavits he presented were admissible under exceptions to the hearsay rule, and that the court erred in refusing to consider them, because those arguments are inconsistent with the district court's holding. The district court noted at the outset that the government had objected to the admission of Mathin's exhibits containing the affidavits and the letters from Nielsen on grounds of authenticity and hearsay. The district court explicitly rejected those challenges to admissibility, noting that those objections might be well taken in another type of case, but that the "affidavits are admissible in this proceeding." Dist. Court Findings of Fact and Conclusions of Law After Trial (March 3, 2014) at 11. The court thus concluded that it would weigh all of the evidence introduced by Mathin, and would resolve any doubts as to authenticity and reliability of the hearsay in light of all the evidence in the case. Because the court held that the documents proffered by Mathin were admissible, we consider only Mathin's challenge on appeal to the court's weighing of the evidence and consideration of authenticity and reliability, as well as his challenge to the IMS Report introduced by the government.

## A.

We begin with Mathin's challenge to the government's evidence. Mathin asserts that the court erred in admitting the IMS Report under Federal Rule of Evidence 803(8), which provides that a record or statement of a public office is not excluded as hearsay if "it sets out ... factual findings from a

legally authorized investigation ... and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."

The IMS report reflected the results of the DSS investigation into Mathin's claim that he was born in the United States. The IMS report included information dating back to the 1996 investigation of his first passport application. As part of that investigation, Special Agent Scott Bultrowicz visited Judith Roper's home based on the affidavit she provided attesting to Mathin's birth. The agent spoke with Roper's roommate, Florence Neel, who told him that Roper was pressured into providing the affidavit, and that when Roper learned her actions were illegal, she experienced a nervous breakdown with physical complications for which she was living in a medical care facility at the time of the agent's visit. Neel also stated that she personally had witnessed Mathin offer Roper $500 in return for her assistance in signing the affidavit. The DSS concluded that the Roper affidavit was obtained through coercion and bribery, and Mathin was arrested in 1996 for passport fraud, although he was not subsequently prosecuted.

The 1996 investigation also determined that the marriage certificate was fraudulent in that the original in India did not list a place of birth but the version submitted by Mathin indicated he was born in the United States. The agent investigating the passport application in 2010, Special Agent Benjamin Hammond, relied on those determinations from the 1996 investigation, and also determined that the affidavits submitted by Mathin that were purportedly from his parents were false or fraudulent because they were not original documents and could not be independently corroborated.

Mathin argues that the court erred in admitting the IMS Report. He asserts that a report following a government investigation is not automatically trustworthy, and that the person making the report must have observed matters firsthand and acted pursuant to a legal duty. Mathin contends that the factual findings and conclusions made by Agent Hammond in the IMS Report relied upon the opinions and conclusions of Agent Bultrowicz in the 1996 investigation, and faults Agent Bultrowicz for failing to interview Roper personally.

The district court properly rejected that challenge to the admissibility of the IMS Report generally. The public records exception of Federal Rule of Evidence 803(8) constitutes a recognition that information may be passed among multiple public officials before being recorded in a document, and accordingly a report will not be excluded merely because the author did not have firsthand knowledge of the reported matters. *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Therefore, the inclusion of information from Agent Bultrowicz was not a bar to admissibility. Mathin has presented no support for his argument that the report was inadmissible because the investigation could have been more thorough. Moreover, the district court properly limited its consideration of the IMS Report to merely the conclusion that the affidavit and the marriage certificate were fraudulent. The court did consider the statements by Neel in the report, as those statements were hearsay within hearsay. *Id.* (Rule 803(8) does not remove the hearsay bar for a statement by a nongovernmental third-party contained in a police report.)

Accordingly, we find no error in the court's consideration of the IMS Report.

B.

We turn, then, to Mathin's challenges to the court's consideration of his evidence. Mathin first argues that the delayed certificate of birth from the State of Illinois, although not conclusive, should have been considered to be significant evidence that he was a United States citizen. He asserts that such a birth certificate is not casually issued by the State of Illinois and that it is issued only when warranted by the evidence.

The district court recognized that the issuance of the certificate by Illinois was evidence favorable to Mathin's claim of citizenship. In determining the weight to be given to that evidence, however, the court examined the documents which formed the basis for the issuance of that certificate. Mathin testified that in seeking the delayed certificate of birth, he provided the State with an affidavit from Judith Roper, who was the midwife's niece who was present at his birth, a marriage certificate from India that stated his place of birth as the United States, and affidavits from his father and Nielsen. The delayed certificate of birth issued by Illinois references only two documents, the Roper affidavit and the marriage certificate, and states that the certificate was issued based on those documents. Therefore, in assessing the weight to be given to the delayed certificate of birth, the district court properly considered only those two underlying documents. The court determined that there were credibility problems with both of those documents which cast doubt on the conclusion

inherent in the delayed birth certificate that he was born in the United States. We defer to a district court's credibility determinations unless clearly erroneous, and here the holding by the court is well supported in the record. See *Furry v. United States*, 712 F.3d 988, 993 (7th Cir. 2013).

First, the marriage certificate from India that Mathin submitted to the court, which was an English translation of the original, listed his place of birth as the United States, but the DSS investigated Mathin's passport application for fraud and determined that the translated marriage certificate was fraudulent. With assistance from the United States Consulate in Mumbai, India, the State Department determined that the original marriage certificate in India listed no place of birth for Mathin and therefore provided no support for his claim of citizenship. The inclusion of a birthplace in the English "translation" was thus fraudulent, and could properly cause the district court to doubt not just the reliability of the delayed certificate of birth, but also the credibility of Mathin in general.

The Roper affidavit presented credibility concerns as well. The district court noted that Roper's affidavit stated that Mathin was born in the Humboldt Park community, a neighborhood on the northwest side of Chicago, which was inconsistent with Mathin's claim that he was born in the 10900 block of South St. Louis, a southwest side region, and with Mathin's statement in another document that his mother lived at 10733 South St. Louis Avenue one year before his birth. Moreover, the court stated that the timing of the documents was suspicious in that both documents were submitted by Mathin at the time he was applying for a United States passport. Finally, the court considered that the State

Department had determined that the Roper affidavit was fraudulent. Mathin argues that the court erred in concluding that the Roper affidavit was inadmissible hearsay, but as we have stated the court in fact held that it was admissible.

In the end, though, the fundamental difficulty with Mathin's argument is that he ultimately seeks a reweighing of the facts from this court, and that is not the province of this court on appeal. It is of no value on appeal to argue that the district court could have found in his favor. We will accept the court's fact findings unless they are clearly erroneous - that is unless we are left with a definite and firm conviction that a mistake has been made. *Buechel v. United States*, 746 F.3d 753, 756 (7th Cir. 2014); *Anderson*, 470 U.S. at 573. "As long as the district court's conclusions are 'plausible in light of the record viewed in its entirety,' we will not disturb them." *Buechel*, 746 F.3d at 756, quoting *Anderson*, 470 U.S. at 573-74. Mathin fails to present arguments that would approach that burden, and therefore cannot succeed in his challenge.

That problem is apparent as well in his challenge to the court's treatment of his testimony and that of his father. Mathin decries the district court's decision to give little probative value to the testimony of Mathin and his father Ziaudeen, but again ultimately he seeks a reweighing of the evidence that is inappropriate on appeal. For instance, he challenges the court's failure to credit the testimony of his father. Ziaudeen testified that Mathin was born in the home of Nielsen, a family friend, in Chicago, and that Nielsen arranged for the family's travel back to India. Ziaudeen further stated that it was not until Mathin was 18 years old that he informed Mathin that Mathin was born in the United States.

The district court's determination that Ziaudeen lacked credibility is well-supported. Ziaudeen's testimony was inconsistent on a number of critical issues. For instance, evidence was introduced at trial that a special agent from the Chennai consulate interviewed Ziaudeen, and that he stated that he had traveled with his wife to the United States, but that he had to depart for Hong Kong and left his wife in the care of Nielsen in Chicago, where she prematurely delivered a baby boy. He told the agent that he did not know whether the baby was born at home or in the hospital, and stated that one month later his wife came back to India with the baby. He further stated that his wife was uneducated and did not register the baby's birth, and that he did not keep in contact with Nielsen. That was inconsistent with his deposition testimony that he was present at Mathin's birth and that they departed for India together. Details such as the presence at the birth of one's child are the type of facts that a person would be expected to remember. It was also inconsistent with Mathin's testimony that Nielsen was a close family friend who kept in touch by sending numerous greetings cards over the years following Mathin's birth.

The district court noted a number of discrepancies in Ziaudeen's testimony such as his explanation as to why he created the 1966 affidavit with his attorney regarding the place of Mathin's birth. Ziaudeen initially testified that he created the 1966 affidavit for Mathin to obtain an Indian passport, but later stated it was to get Mathin into school although Mathin was less than a year old at the time of the affidavit. The district court could properly deem Ziaudeen's testimony incredible in light of the inconsistencies.

Mathin nevertheless asserts that the court erred in finding that Ziaudeen lacked credibility, arguing that Ziaudeen suffered from health problems and the court should have considered that in assessing any inconsistencies. The court heard the testimony regarding those health problems, however, and there is nothing in the record that indicates the court disregarded that in making the credibility determination. Mathin wants us to make a contrary credibility determination, but the finding by the court was not clearly erroneous and it is not our role to reweigh evidence. See *Furry*, 712 F.3d at 993. Moreover, the health issues that Mathin points to as an explanation for the inconsistencies are not the type of issues that would impact memory or the ability to effectively relay information. The only health issues established in the record concern Ziaudeen's difficulties in standing or sitting for long periods of time, and his age of 79. There was no evidence of any issues with memory or mental health that would impact his ability to recall facts. In fact, Mathin acknowledged in his testimony at trial that his father did not have cognitive problems or difficulties with memory generally. Nor is Mathin arguing that a prior recollection is more reliable; Mathin instead is asserting that as to testimony given on the same date, one response should be credited over another. The district court did not clearly err in considering the testimony as a whole, and in light of the circumstances as a whole, determining that Ziaudeen's testimony was not credible.

Similarly, there was no error in the court's failure to credit Mathin's testimony as to where he was born. His knowledge stemmed only from his claims that Ziaudeen and Asiaumma told him that he was born in the United States. Although

Mathin argues that his reputation among his family was that he was born in the United States, he did not provide evidence from any of his five living siblings corroborating that fact. Mathin argues that his mother's statement was not inadmissible hearsay because Federal Rule of Evidence 804 allows testimony as to a declarant's family history if the declarant is unavailable as a witness. The district court found that Mathin's testimony, which was not based on first-hand knowledge but was based on purported statements from his parents, was of little value. We have already discussed the court's credibility determination as to Mathin's father Ziaudeen. As to Mathin's claim that his mother told him he was born in the United States, Mathin's testimony was internally inconsistent on that point. He stated that his mother did not tell him he was born in the United States until he was 13 years old, at which time she told him in the presence of Ziaudeen. Yet Mathin acknowledged that he did not recall her telling him that information, and that his knowledge stemmed solely from Ziaudeen's retelling of the conversation. On cross-examination, Mathin stated that his mother never told him that he was born in the United States. Therefore, the district court did not err in failing to find that testimony probative of his birthplace.

Finally, Mathin asserts that the court erred in failing to credit the 1966 affidavits that he submitted in support of his claim from his mother and father, and from Krishnamurthy. The 2007 letter from Krishnamurthy stated that he had located affidavits from Ziaudeen and Asiaumma upon a search of his warehouse. He also attested that he witnessed the signatures of Ziaudeen and Asiaumma on their affidavits. The affidavits

of Ziaudeen and Asiaumma recite that they traveled to the United States where Asiaumma delivered Mathin in Chicago on September 9, 1965. The affidavits from Mathin's parents were purportedly created in 1966, but the district court properly determined that those documents should not be credited.

Under Federal Rule of Evidence 803(16), statements in an ancient document that is at least 20 years old and whose authenticity is established are not excluded as hearsay. The district court noted that it had significant doubts as to the authenticity of the documents under Federal Rule of Evidence 901(b)(8), which provides that an ancient document can be authenticated by showing that it is at least 20 years old, was in a place where, if authentic, it would likely be, and is in a condition that creates no suspicion about its authenticity. The requirement that the document be free of suspicion relates not to the content of the document, but rather to whether the document is what it purports to be, and the issue falls within the trial court's discretion. *United States v. Firishchak*, 468 F.3d 1015, 1021 (7th Cir. 2006); *United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir. 1986); *United States v. Kalymon*, 541 F.3d 624, 632-33 (6th Cir. 2008). "[T]he mere recitation of the contents of documents does not authenticate them or provide for their admissibility." *Firishchak*, 468 F.3d at 1021.

The district court properly held that there was reason to doubt that the affidavits were what they purported to be. Although the affidavits were purportedly created approximately nine months after Mathin's birth, the affidavits lacked any details that might be expected in a document created shortly after such an event, such as precisely where

Mathin was born, arrival and departure dates for their travel, and contact information as to Nielsen or other witnesses. Significantly, the affidavits also lacked any declared purpose for their creation. The testimony of Ziaudeen's father as to the purpose of the affidavits was notably inconsistent. Ziaudeen first testified that he did not have any idea as to why he would have created such an affidavit in 1966. Subsequently in the deposition, Ziaudeen testified that he created the affidavit to help Mathin obtain an Indian passport. An affidavit attesting to his birth in the United States, however, could not aid in securing an Indian passport for Mathin. Moreover, Mathin testified that he traveled on his mother's Indian passport until he was 13 years old, which is also inconsistent with the notion that the affidavit was created in order to secure an Indian passport for Mathin. The court did not err in concluding that the failure to identify any purpose for the affidavit, as well as the dearth of details in the affidavit itself, cast doubt on the claim that it was in fact created by his parents in 1966. The fortuitous timing of Krishnamurthy's discovery of the affidavit in the warehouse further creates doubt as to the legitimacy of the affidavits, as does the court's determination that Ziaudeen's testimony was incredible. Those findings are well-supported in the record, and the court did not err in determining that those affidavits were not reliable evidence as to his birth.

Finally, Mathin presented an affidavit addressed to the Consulate General of India in New York dated October 15, 1965—approximately one month after Mathin's birth—signed by Thomas Nielsen and witnessed by Margaret Roper, Ina Nielsen and Judith Roper, affirming that Mathin was born at

Nielsen's house on September 23, 1965. The stated purpose of the affidavit was to obtain a travel permit to travel to India, and Nielsen allegedly discovered the document among his mother Ina Nielsen's possessions upon her death. Mathin also submitted an affidavit from Nielsen dated April 13, 2000 declaring that the 1965 affidavit was true and correct and was provided to the Indian Consulate General to allow Mathin to travel to India. A notary attested that the signature in that April 2000 affidavit was that of Nielsen.

There are myriad problems with this affidavit, including once again difficulties in establishing that the document was in fact created at the stated date. Mathin failed to establish the date of origin, nor was there any basis to conclude that the document was kept in a place where, if authentic, it would likely be. As the district court noted, Mathin failed to explain why Ina Nielsen would have had in her possession an original letter delivered to the Indian Consulate General in 1965. Nor is it conceivable that Nielsen would create and forward such an affidavit to establish the birth, yet not assist Mathin's parents in simply obtaining a birth certificate for Mathin at the time of birth, particularly given Mathin's claim that he was taken for examination to a hospital following his birth. Mathin also failed to produce any evidence that under Indian law in 1965 an undocumented infant could travel on his mother's passport. The insurmountable obstacle to credibility, however, is the uncontested evidence that Nielsen's signature on the April 2000 affidavit which was verified by the notary is starkly different from the signature on the 1965 affidavit. Mathin asserts that signatures may change over time, but the differences in the handwriting are so stark that Mathin

acknowledged to the district court that the signatures were in fact different. Mathin submitted three greeting cards that he claimed to have received from Nielsen, and there is no dispute that those signatures were also distinct from the others; in fact the name Nielsen was even spelled differently, as "Nelson," in those cards. The district court properly determined that those disparities created a strong reason to suspect that the Nielsen affidavit was fraudulent. There is no error in that quite reasonable conclusion. In short, although Mathin has presented multiple arguments as to why the district court could have reached different fact findings in this case, he has failed to demonstrate that the district court's findings were clearly erroneous.

The court's determination is well-supported in the record. Accordingly, the decision of the district court is AFFIRMED.