RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0336p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 07-1965

JOHN KALYMON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 04-60003—Marianne O. Battani, District Judge.

Argued: August 1, 2008

Decided and Filed: September 4, 2008

Before: DAUGHTREY and McKEAGUE, Circuit Judges; VAN TATENHOVE, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David A. Domina, DOMINALAW GROUP, Omaha, Nebraska, for Appellant. William Henry Kenety V, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David A. Domina, DOMINALAW GROUP, Omaha, Nebraska, Elias T. Xenos, METROLAW, Farmington Hills, Michigan, for Appellant. William Henry Kenety V, Todd Schneider, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. American citizenship is "precious," and revoking it "can have severe and unsettling consequences." *Fedorenko v. United States*, 449 U.S 490, 505 (1981) (citation omitted). Nonetheless, failure to comply strictly with all of the congressionally imposed citizenship prerequisites, such as lawful entry into the country as a permanent resident, "renders the certificate of citizenship 'illegally procured'" and it can be set aside. *Id.* at 506 (quoting 8 U.S.C. § 1451(a)).

John Kalymon entered the United States after World War II as a permanent resident and later gained citizenship. In 2004, the Government sought to revoke his citizenship, alleging that his activities during the war made him ineligible for entry. After a bench trial, the district court held

_____

[*] The Honorable Gregory Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

that the Government proved by clear, convincing, and unequivocal evidence that Kalymon persecuted Jews during the war, advocated or acquiesced in conduct contrary to civilization and human decency, and misrepresented a material fact on his visa application. The district court revoked Kalymon's citizenship.

On appeal, Kalymon raises several claims of error, including mistaken identity and various evidentiary errors by the district court. For the following reasons, we affirm.

# I

## A.      Nazi-Germany's Occupation of the City of L'viv

In 1941, Nazi-Germany invaded the European part of the Union of Soviet Socialist Republics, including the city of L'viv (in what is now the Ukraine), to implement its vision of a new racial order. L'viv became part of District Galacia, an administrative unit of the General Government created by Nazi-Germany during World War II. The General Government was a German-run government set up to rule parts of Poland and the Ukraine.

The Nazi-Germans enacted a set of racially motivated policies against civilian populations under their control, particularly Jewish populations. The district court summarized the persecutory measures Nazi-Germany enforced against the Jews in District Galacia, particularly in L'viv:

> Nazi persecutory policy toward the Jews in District Galicia included 1) confining all Jews in ghettos and issuing new identification papers that identified them as Jews; 2) forcibly removing Jews from the ghetto for subsequent murder either by shooting or gassing; and 3) sparing a limited number of Jews whom the Germans considered "work capable" until they were transferred to forced labor camps where many died from starvation, disease and other inhumane conditions.

*United States v. Kalymon*, No. 04-60003, 2007 WL 1012983, at *3 (E.D. Mich. Mar. 29, 2007).

## B.      The Ukrainian Auxiliary Police

The occupying German Reich established the Ukrainian Auxiliary Police ("UAP") in L'viv to maintain public order and to assist with constabulary police functions. The UAP was subordinate to the German Order Police, the general German police force, separate from both the German Security Police (ordinary criminal police) and the German Gestapo (secret state police). The UAP was divided into "commissariats." Each commissariat was responsible for a geographic section of the city. UAP members were recruited, but they were never drafted or required to serve. Each UAP member had a personnel file, was given uniforms, armed, paid a salary, and received other benefits such as food and firewood.

Candidates took oaths of loyalty to the German administration. Dr. Dieter Pohl, an expert historian, testified that Nazi ideological training (including instruction about the German Reich, Adolf Hitler, racial structure, and the Jewish people) was required for all UAP personnel. Training also included marching, exercise, and German language instruction. An oath of allegiance to the occupying German Reich was, likewise, required for most positions in the UAP.

Strict rules governed the issuing of firearms and ammunition. UAP policemen were trained in the use of firearms. Each UAP commissariat maintained a register that could be used to verify the issuance and return of firearms and munitions as well as the use of any munitions. One firearm was assigned to each pair of policemen during a shift, and duty officers returned the assigned firearms to the commissariat at the end of their shift. Notes were recorded in the register confirming

that firearms and munitions were clean and fully transferred. Ammunition was, likewise, tightly regulated due to concerns over its supplies.

The UAP routinely enforced persecutory measures against the Jewish population, including control of the black market, mandatory armbands, curfews, and cleanliness violations. Documents indicated that UAP members also performed "extraordinary" duties with regard to the Jewish ghetto. These duties included participating in sweeps to reduce the Jewish ghetto population, manning cordon posts around the city to prevent Jews from escape, escorting and guarding Jews at and between assembly points, and searching for Jews attempting to hide or escape. In addition, the district court identified at least five distinct operations during which UAP members rounded up the Jewish population for transportation to a forced labor camp, deportation, or extermination. *Kalymon*, 2007 WL 1012983, at *5-7. UAP members shot at and killed Jews who attempted to escape during these operations.

## C.     Kalymon's UAP Service

Kalymon was born "Jan Kalymun" in Poland in 1921. In 1939, he moved to Bomblitz, Germany. In late 1941, Kalymon moved to L'viv, where he applied for and was hired as a police private in the UAP.

Kalymon admitted that he served in several UAP commissariats from at least May 1942 to March 1944. He testified that his duties in the UAP consisted of being a peacekeeper. He claimed never to have possessed or fired a firearm while on duty. Moreover, Kalymon asserted that he had no contact with or knowledge of the Jewish population in L'viv.

The Government relied upon several wartime documents to show that Kalymon was more involved in persecuting civilians, especially Jews, than he claimed. Several of these documents identified "Ivan," "Iwan," or "Jan" "Kalymon" or "Kalymun" as a UAP policeman. Defendant admitted that "Ivan" was essentially the equivalent of "Iwan" and "Jan." Dr. Pohl testified that German documents would account for the use of "Iwan," whereas in Cyrillic the name would be "Ivan" and in Polish the name would be "Jan." Defendant also admitted that he has used two spellings of his surname ("Kalymon" and "Kalymun") during various times of his life. While his birth record indicated his surname as "Kalymun," Defendant testified that he used "Kalymon" exclusively after 1941. According to the district court, the "Kalymon" spelling appears in many of the more innocuous documents (e.g., salary declaration, list of policemen receiving uniform fabric, driver's license). *Kalymon*, 2007 WL 1012983, at *10. On the other hand, the surname is spelled "Kalymun" in each document referencing the use of ammunition. *Id.*

Defendant testified that he did not know of any other UAP officers using the name "Kalymon" or "Kalymun" while serving in the UAP. Nonetheless, records indicated that there were three individuals with the name "Kalymon"—Roman, Stefan, and Ivan. However, there is no evidence showing that any other person served in the UAP with a surname spelled "Kalymun." One document admitted as evidence that used the spelling "Kalymun" contained Defendant's admitted date and place of birth. Moreover, Defendant admitted to serving in the Fourth, Fifth, and Seventh Commissariats in L'viv during the same time period that a person bearing the name "Ivan/Iwan" "Kalymun/Kalymon" served in these same units. In summary, the district court explained that the record showed no other person "bearing the name 'Ivan/Iwan' 'Kalymun/Kalymon,' with the same date and place of birth as Defendant, served in the UAP between May 1942 and March 1944, in the same commissariats as Defendant." *Id.*

While Kalymon testified that he did not participate in the rounding up or in the transportation of Jews from the ghetto, the district court noted that several documents countered his assertion. Documents indicated that "[o]n May 6, 1942, Iv Kalymun generated a cleanliness inspection report,

in which he reported nonconforming properties." *Id.* at *11. Additionally, "[o]n May 11, 1942, Ivan Kalymun and another policeman were assigned to escort an unknown number of Jews to Pluvhov, the location of a SS-run, forced labor camp" and each expended six rounds of ammunition. *Id.* A report dated August 14, 1942, indicated that "Iv Kalymun recorded that he fired four shots while on duty," wounding one Jew and killing another. *Id.* Further, the chief of the commissariat filed a summary report on the same date indicating that policemen "delivered 2,128 Jews to a central assembly point." *Id.* The report stated that twelve Jews were "killed while escaping," seven Jews were wounded, and that "Ivan Kalymun" expended four rounds of ammunition. *Id.* Additionally, on August 20, 1942, "Kalymun" fired two rounds of ammunition used during operations where 525 Jews were delivered to an assembly point; fourteen Jews were shot and killed and six were wounded. *Id.* at *12. The following day, "Ivan Kalymun" shot two rounds of ammunition in an operation where policemen rounded up and delivered an additional 805 Jews. *Id.* In June 1943, Kalymon's commissariat participated "in the liquidation of the Jewish ghetto" where Jews were shot or sent to forced labor camps. *Id.* From November 19 through 23, 1943, all UAP members in L'viv, including those in Kalymon's commissariat, participated in massive search operations to locate and to turn over any remaining Jews in the ghetto to German authorities. *Id.* UAP members patrolled the streets and manned roadblocks to screen all those who exited the city. *Id.*

In 1944, Kalymon married. Sometime after March 1944, he resigned from the UAP.

## D.       Immigration to the United States

In March 1949, Kalymon requested that the United States Displaced Persons Committee ("DPC") qualify him as a "displaced person" under the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 ("DPA"), so that he would be eligible to immigrate to the United States. On his application, Kalymon stated that he was employed in Kavanca, Poland from 1939 until 1943 and that from 1943 to 1944 he attended vocational school in Lwow, Poland. Based upon the information that Kalymon submitted, the DPC declared him an eligible displaced person.

Kalymon subsequently applied for a visa in April 1949 to enter the United States. In his application, Kalymon stated that he resided in Komantscha, Poland from 1939 to August 1943 and in Lemberg, Poland from 1943 to 1944. He listed his occupation as "shop assistant," but made no mention of his service in the UAP. He later explained that he lied because he was fearful of being repatriated to the Soviet Union.

Regarding the absence of any information about Kalymon's past involvement in the UAP, Mario DeCapua, then-head of the Security Investigations Division of the DPC, testified that although the UAP was not on the Inimical List (a list of organizations whose members were ineligible under the DPA), membership in organizations not named on the list could be a disqualifying factor under the DPA. DeCapua also testified that any wartime activities were to be noted in a report to the DPC. Likewise, William Arket, a former United States Army Counterintelligence Corps agent who investigated Kalymon's background, testified that had Kalymon reported his wartime service in the UAP, it would have been reported because employment in a police force in Nazi-occupied territory was considered a negative factor. Finally, Kenneth Smith, former United States Department of State Vice Consul, testified that information that an applicant had served in a police force in an area occupied by Nazi forces, if known to the Vice Consul, would have tended to affect the decision regarding eligibility.

Based on the information that Kalymon supplied to authorities, the United States Consulate in Munich, Germany issued him a visa under the DPA. In May 1949, Kalymon used his visa to enter the United States. After petitioning for naturalization in September 1955, Kalymon received a certificate of naturalization on October 11, 1955.

**E.      The Government Brought Denaturalization Proceedings Against Kalymon**

After the fall of the Soviet Union, the United States gained access to previously unaccessible World War II-era archives. Among these archives were records implicating a number of immigrants to the United States who had hid their Axis military service or activities assisting the Axis powers. Government investigators eventually uncovered records that called into question Kalymon's entry into the United States as a displaced person under the DPA.

In 2004, the Government filed a civil complaint against Kalymon seeking to revoke his citizenship and to cancel his certificate of naturalization. The Government brought four claims against him, any one of which would have been a sufficient ground for relief. In Count I, the Government contended that Kalymon's service in the UAP amounted to assistance in the persecution of civilians, rendering him ineligible for a visa under § 2(b) of the DPA. In Count II, the Government alleged that Kalymon's service constituted membership or participation in a movement hostile to the United States, rendering him ineligible for a visa under § 13 of the DPA. Next, in Count III, the Government maintained that he willfully misrepresented his wartime service in the UAP to obtain a visa, rendering him ineligible for a visa under § 10 of the DPA. And, finally, in Count IV, the Government asserted that his service in the UAP constituted the advocation or acquiescence in activities or conduct contrary to civilization and human decency, in violation of then-existing State Department regulations governing visas.

The district court held a bench trial and later issued its findings of fact and conclusions of law. The district court found that Kalymon's service in the UAP, including the extraordinary duties he performed against Jews, amounted to persecution as well as conduct contrary to human decency. *Kalymon*, 2007 WL 1012983, at *16, 18. Moreover, the district court found that Kalymon willfully lied to immigration authorities about his wartime activities and that those lies were material. *Id.* at *18. It did not find, however, that Kalymon's membership in the UAP alone constituted membership or participation in a movement hostile to the United States. *Id.* at *17. Accordingly, the district court held for the Government on Counts I, III, and IV of its complaint. *Id.* at *19. The district court ordered that Kalymon's certificate of naturalization be canceled and that the 1955 order granting him citizenship be revoked. *Id.* It subsequently denied Kalymon's motion for a new trial or to amend the judgment. *United States v. Kalymon*, No. 04-60003, order (E.D. Mich. June 6, 2007).

Kalymon appealed.

## II

**A.      Standard of Review**

Under Federal Rule of Civil Procedure 52, we "must not . . . set aside" the district court's findings of fact "unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). We must also "give due regard to the trial court's opportunity to judge the witnesses' credibility." *Id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (internal citations omitted).

As for the district court's legal conclusions, we review those de novo. *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004).

**B.      P112**

Before reaching the merits of the district court's analysis, we briefly address two claims of error over the admission of a particular document labeled "P112." Briefly, P112 is a hand-written note, dated August 14, 1942, in which "Iv Kalymun" recorded that he fired four shots while on duty during the Jewish operation that day. One person was wounded and one was killed. The district court attributed the document, among others, to Kalymon. On appeal, he argues that the district court should have received expert handwriting analysis in order to authenticate the handwriting, rather than rely on its own handwriting comparison. He also argues that the document should not have been admitted as an ancient document in the first place. We review the district court's rulings regarding the admissibility of documents for an abuse of discretion. *United States v. Firishchak*, 468 F.3d 1015, 1021 (7th Cir. 2006).

In general, expert opinion on handwriting is not necessary for authentication under Federal Rule of Evidence 901. *United States v. Saadey*, 393 F.3d 669, 679-80 (6th Cir. 2005). Instead, Rule 901(a) states that a document is admissible if there is satisfactory evidence to support that the document is what it purports to be. Rule 901(b)(3) in turn provides that the trier of fact can authenticate a signature by identifying and comparing it with a signature already authenticated. *United States v. Spano*, 421 F.3d 599, 605 (7th Cir. 2005) (explaining that "no rule of evidence makes a [factfinder] incompetent to determine the genuineness of a signature by comparing it to a signature known to be genuine").

As Kalymon concedes on appeal, his signature on his L'viv driver's license, admitted as evidence, served as a viable authenticating exemplar. The district court heard testimony from Dr. Antonio Cantu, an ink and paper examiner, and from Dr. Pohl explaining that P112 was an authentic wartime document. The district court explained that it attributed P112 and several other documents to Kalymon because of the absence of anyone with a similar sounding name who served in the UAP at the same time, and because some of the documents using the spelling "Kalymun" bore Kalymon's admitted date and place of birth. *Kalymon*, 2007 WL 1012983, at *10. Without more, Kalymon's bald allegation that the handwriting on P112 was a forgery did not require that the district court seek out the opinion of a handwriting expert.

Next, in his reply brief, Kalymon argues for the first time that P112 should not have been admitted under the hearsay exception for ancient documents. Issues raised for the first time in a reply brief are considered waived on appeal. *United States v. Demjanjuk*, 367 F.3d 623, 637 (6th Cir. 2004). In any event, Kalymon's argument is without merit. Federal Rule of Evidence 803(16) provides an exception to the rule against hearsay for "[s]tatements in a document in existence twenty years or more" if the document is authenticated. A document can be authenticated under Rule 901(b)(8) by showing, among other things, that the document's condition creates "no suspicion concerning its authenticity." "The question of whether evidence is suspicious, and therefore inadmissible, is within the trial court's discretion." *Demjanjuk*, 367 F.3d at 631 (citation omitted). Suspicion does not go to the content of the document, but instead, "to whether the document is what it purports to be." *Id.* (citation omitted). The content of the document is a matter of evidentiary weight left to the sole discretion of the trier of fact. *United States v. Mandycz*, 447 F.3d 951, 966 (6th Cir.), *cert. denied*, 127 S. Ct. 414 (2006).

Kalymon admits that there is sufficient evidence that P112 is an authentic World War II record. Rather, he argues, again, that there is no proof he signed it. Yet, whether or not the signature was his is a question that goes to the content of the document, not whether the document is what it purports to be—i.e., a wartime record. The district court did not err in admitting P112.

### C.    Denaturalization

#### 1.    Proceedings in General

As explained above, Kalymon is a naturalized citizen. Under the Immigration and Nationality Act of 1952, if a person "illegally procured" his citizenship or otherwise procured it "by concealment of a material fact or by willful misrepresentation," then the person's citizenship must be revoked. 8 U.S.C. § 1451(a). "[T]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship. Failure to comply with any of these conditions renders the certificate of citizenship 'illegally procured' and naturalization that is unlawfully procured can be set aside." *Fedorenko*, 449 U.S. at 506 (quoting 8 U.S.C. § 1451(a)). However, the Government has a heavy burden of proof during denaturalization proceedings. *Id.* at 505. "The evidence justifying revocation of citizenship must be clear, unequivocal, and convincing and not leave the issue in doubt." *Id.* (internal quotation marks omitted).

#### 2.    Persecution and Conduct Contrary to Civilization and Human Decency

One of the prerequisites to becoming a naturalized citizen is lawful admission into the United States pursuant to a valid visa. *United States v. Dailide*, 227 F.3d 385, 390 (6th Cir. 2000). In 1948, Congress enacted the DPA to enable European refugees of war to emigrate from their home country to the United States irrespective of traditional immigration quotas. *Fedorenko*, 449 U.S. at 495. A person who sought to enter the United States under the DPA first had to qualify as a refugee or displaced person with the International Refugee Organization of the United Nations ("IRO"). *Demjanjuk*, 367 F.3d at 629. The DPA created a multi-layered system to determine an applicant's eligibility as a displaced person. *Fedorenko*, 449 U.S. at 495. An IRO official would first interview an applicant, followed by an official from the DPC. *Id.* at 495-96. The officials would report their findings to a State Department vice consul who made the final decision on eligibility. *Id.* at 496. Following the vice consul's decision, Immigration and Naturalization Service officials reviewed the application to ensure that the applicant was admissible to the United States under the immigration laws. *Id.*

One class of persons who was automatically excluded from the definition of "displaced persons" was anyone who "'assisted the enemy in persecuting civil[ians]'" or who "had 'voluntarily assisted the enemy forces . . . in their operations.'" *Id.* at 495 (quoting Annex I to the Constitution of the IRO, Part II, 62 Stat. 3051-3052). Whether one assisted in the persecution of civilians was to be determined by a person's actual conduct rather than, for example, his "mere membership in an enemy group." *Dailide*, 227 F.3d at 395.

In addition, State Department regulations precluded the issuance of a visa to any person who "advocated or acquiesced in activities or conduct contrary to civilization and human decency." 22 C.F.R. § 53.33(j) (1949). Mere membership in an organization was, again, usually not enough. *United States v. Koreh*, 59 F.3d 431, 442 (3d Cir. 1995).

As the district court correctly noted, Kalymon's participation in general police duties did not constitute assistance in the persecution of civilians. *Kalymon*, 2007 WL 1012983, at *15. However, the district court found that some of the general duties of a UAP member encompassed enforcing persecutory measures against Jews. *Id.* Furthermore, the district court found that Kalymon engaged in several "extraordinary" acts with regard to the L'viv Jewish ghetto, "such as taking part in sweeps of the ghetto during periodic reduction actions; manning cordon posts around the city to prevent Jews from escaping before and during such actions[;] and hunting for Jews who attempted to hide or flee." *Id.*

Kalymon does not dispute that these duties and acts would amount to persecution excluding the actor from the definition of a displaced person. *See United States v. Sokolov*, 814 F.2d 864, 874

(2d Cir. 1987) ("Webster's Dictionary defines 'persecution' as 'the infliction of sufferings, harm, or death on those who differ . . . in a way regarded as offensive or meriting extirpation,' and as 'a campaign having for its object the subjugation or extirpation of the adherents of a religion.'"). Nor does he dispute that these duties and acts would also constitute advocating or acquiescing in conduct contrary to civilization and human decency. *See Firishchak*, 468 F.3d at 1026 (explaining that "given the facts established at trial, the district court properly concluded that Firishchak's UAP service constituted conduct contrary to human decency"). Instead, he argues that he did not engage in these duties or acts. He argues that the discrepancy between the surname he used at the time, "Kalymon," and the UAP member's surname referenced in several of the wartime documents, "Kalymun," adds "a layer of suspicion" to the evidence. Appellant's Br. at 28. Additionally, he argues that the document (P112) indicating that "Iv. Kalymun" fired four shots, killing one and wounding another, did not reference him because he never shortened his name to "Iv."

Due process "does not require ideal accuracy" of spelling, "even in names." *Grannis v. Ordean*, 234 U.S. 385, 395 (1914). "In the spelling and pronunciation of proper names there are no generally accepted standards; and the well-established doctrine of *idem sonans* [the same sound] . . . is a recognition of this." *Id.* at 395-96. This court has held that the spelling of names in wartime documents does not need to be accurate so long as the phonetic sound is maintained. *Mandycz*, 447 F.3d at 957 (explaining that because the guard recorded in the document "had the same first name as Mandycz and the same phonetic last name as Mandycz, the transfer records support the district court's decision").

It is undisputed that the wartime documents recording these persecutory acts attributed them to "Kalymun," which is phonetically identical to Defendant's admitted surname. Moreover, Defendant admitted to using both spellings ("Kalymon" and "Kalymun") during his lifetime. "Iv" clearly could be an abbreviation for "Ivan." While Defendant testified that he never used that abbreviation, whether to accept his assertion was a matter of credibility for the district court to decide. *Anderson*, 470 U.S. at 575.

Given the linguistic identity between the first names, the phonetic identity between the surnames, and the absence of any other "Ivan/Iwan/Jan" "Kalymon/Kalymun" combination, with the same date of birth and birthplace serving in the UAP at that time, the district court did not clearly err in concluding that Defendant was the individual identified in the wartime records who committed the recorded persecutory acts. The district court's finding was sufficient to revoke Kalymon's citizenship under either Count I (not a displaced person under the DPA) or Count IV (advocating or acquiescing in conduct contrary to civilization and human decency, in violation of visa regulations). Accordingly, we affirm the district court on these counts.

### 3.      Import of Kalymon's Admitted Misrepresentation About his Work Experience

Section 10 of the DPA provides that any person who made "a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." DPA § 10, 62 Stat. 1013. However, this provision applies only to willful misrepresentations of material facts. *Fedorenko*, 449 U.S. at 507 n.28. A misrepresentation "is material if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (quoting *Weinstock v. United States*, 231 F.2d 699, 701-02 (D.C. Cir. 1956)). "Thus, for purposes of determining the natural tendency of a misrepresentation to affect a decision . . ., what is relevant is what would have ensued from official knowledge of the misrepresented fact . . . ." *Id.* at 775 (plurality). However, the Government is not required to prove that the defendant would not have been granted a visa but for the misrepresentation. *Demjanjuk*, 367 F.3d at 636-37. Materiality of a misrepresentation is a question of law. *Kungys*, 485 U.S. at 772.

Although Kalymon concedes that he willfully misrepresented his UAP employment, he argues that the misrepresentation was not material. He attacks the district court's finding of materiality on two grounds: (a) the logical impossibility of finding that a person made a material misrepresentation about his service during World War II while at the same time finding that the service was not as a member of a hostile movement against the United States; and (b) the admission of certain expert testimony and reports concerning materiality was reversible error. Both grounds are taken up in turn.

Kalymon contends that the district court could not logically find both that the Government failed to meet its burden to show that the UAP was a hostile movement under Section 13 of the DPA and that his lying about his service in the UAP was material. There is, however, no logical or legal incongruity in the district court's findings. Whether the UAP as an organization was hostile to the United States is a different question than whether Kalymon's misrepresentation about his own activities during the war would have had a natural tendency to influence, or was capable of influencing, the decision of immigration officials. For example, a person could persecute someone without being a member of a hostile movement; if it were otherwise, the latter class would subsume the former, making § 2 of the DPA superfluous. As discussed above, persecution itself can make one ineligible to be a displaced person under the DPA. Thus, one could be precluded from gaining a visa solely because he persecuted against Jews even if he did not belong to a hostile movement. Lying about his persecutory actions would, therefore, be lying about something that would preclude him from gaining a visa, i.e., a material fact. *Fedorenko*, 449 U.S. at 509 ("At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa.").

The district court correctly found that Kalymon's wartime activities, including his service in the UAP and his activities as a UAP member, were material facts. Had the investigating officials known about his service and at least some of his general duties in the UAP, they would have investigated further, as several of the Government's experts indicated. In doing so, they might have learned about his extraordinary activities, including rounding up and shooting Jews, killing at least one of them. Had they learned of these activities, Kalymon would not have received a visa. Thus, the information Kalymon kept from the investigating officials clearly was capable of at least influencing the officials' investigation and ultimate decision to grant him a visa.

But, Kalymon argues, the Government's experts on DPA investigations and procedures should have been disqualified from testifying. He asserts in particular that three witnesses failed to meet the reliability threshold for expert testimony because they were admittedly not experts of Eastern European or Ukrainian political history or experts of the UAP.

Fed. R. Evid. 702 states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

We apply an abuse-of-discretion standard when reviewing a district court's decision to admit or exclude expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). A district court "has broad discretion in the matter of the admission or exclusion of expert evidence, and [the court's] action is to be sustained unless manifestly erroneous." *Demjanjuk*, 367 F.3d at 633 (citation omitted). This discretion is at its zenith during a bench trial. *Id.*

In the first place, it is questionable to what extent the district court relied upon the immigration witnesses' testimony to reach its legal conclusion that Kalymon's misrepresentations were material. The district court did not cite or discuss their testimony in its analysis of materiality. *See Kalymon*, 2007 WL 1012983, at *18. The district court cited decisions by other courts dealing with essentially the same issue: whether lying about one's involvement in the Ukrainian or other Eastern European police or military during World War II constituted a material misrepresentation. *See United States v. Kowalchuk*, 773 F.2d 488, 497 (3d Cir. 1985) (Immigration officials paid "[c]lose attention . . . to the applicant's occupation and residence during the war years . . . . Persons who had served in the Ukrainian police or militia would have been ineligible."); *Maikovskis v. INS*, 773 F.2d 435, 442 (2d Cir. 1985) (determining that a visa applicant "known to have served with the Latvian police would have had his background fully investigated to determine whether he assisted in persecution"); *United States v. Koziy*, 728 F.2d 1314, 1319-20 (11th Cir. 1984) (explaining that had the defendant "disclosed his connection with the police force in his visa application, his application would have been rejected outright, or at the least, an investigation would have commenced which might have led to a denial of citizenship"); *United States v. Osidach*, 513 F. Supp. 51, 101-02 (E.D. Pa. 1981) (finding that the claim by a Ukrainian policeman that he had been a dairy technician was a material misrepresentation under the DPA).

Furthermore, the Government did not offer the three immigration witnesses as historical experts about World War II in general or wartime Eastern Europe, the Ukraine, or the UAP. (Kalymon raises no claim of error on appeal with regard to the Government's historical expert, Dr. Pohl.) Nor did the Government offer their testimony to prove that Kalymon, in fact, engaged in the various wartime activities alleged in the complaint. "[E]xperts may base their testimony upon information not within their personal knowledge or observation." *Dailide*, 227 F.3d at 392 (citing Fed. R. Evid. 702, 703). Thus, Kalymon's argument that the witnesses' views should be discounted because they assumed as true the Government's allegations loses its steam. Instead, the Government offered the immigration witnesses for testimony regarding their experience in the processing of DPA visa applications. DeCapua, in fact, helped to develop the very procedures used by the officials to investigate and report the wartime activities of potential displaced persons. The witnesses offered testimony to show that, assuming arguendo that officials had known about Kalymon's wartime activities, the officials would have investigated his background much more closely. On this subject—DPA policies and procedures—Kalymon is virtually silent on appeal. While he does point out that Smith testified that he had not heard of the term "hostile movement," *see* Appellant's Br. at 47, such an isolated matter is hardly sufficient to show that the district court abused its discretion in admitting his testimony or the testimony of the others, *cf. Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001) (explaining that the court will find "an abuse only if [it is] firmly convinced that the district court erred"). Our review of the bases for their testimony confirms that the district court did not abuse its discretion.

As to the reports of the three experts, Kalymon argues that the district court should have rejected them because, in Kalymon's view, the substantive content of the reports was almost entirely the product of the Government. For support, he cites to testimony in which the experts explain that they told Government counsel their substantive opinions, and then counsel reduced those opinions to writing for the experts' review and signature. Contrary to Kalymon's contention, there is nothing inherently nefarious in this. All that the rules require is that an expert submit a written report signed and prepared by the witness, and that "'[t]he report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor.'" *Dailide*, 227 F.3d at 392 n.6 (quoting a prior version of Fed. R. Civ. P. 26(a)(2)(B)). The Advisory Committee Notes to Rule 26 (1993 amendments) state,

> Rule 26(a)(2)(B) does not preclude counsel from providing assistance to experts in preparing the reports . . . . Nevertheless, the report, which is intended to set forth the

substance of the direct examination, should be written in a manner that reflects the
testimony to be given by the witness and it must be signed by the witness.

A party's attorney can reduce an expert's oral opinion to writing so long as the report reflects the actual views of the expert.

Thus, there being no legal error in finding "material" a misrepresentation about wartime activities as part of a police force not otherwise determined to be a hostile movement against the United States, and there being no abuse of discretion in admitting the expert witness testimony and reports about the DPA procedures, we affirm the district court on Count III as well.

## III

Accordingly, for the reasons set forth above, we AFFIRM the district court on Counts I, III, and IV of the Government's complaint against Kalymon.