NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0146n.06

Nos. 13-5205; 13-5206; 13-5207; 13-5208

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 21, 2014
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| SOKBAY LIM, SONA NGOV, PHECH HOU ENG, | ) | UNITED STATES DISTRICT |
| and SOKUNTHY SO, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
|     Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

Before: DAUGHTREY, KETHLEDGE, and DONALD, Circuit Judges.

KETHLEDGE, Circuit Judge. Sokbay Lim, Phech Hou Eng, Sona Ngov, and Sokunthy So appeal their convictions for conspiracy to commit marriage fraud. They each raise numerous and different arguments. We reject their arguments.

I.

From 1999 to 2010, five men—Vuthea Niev, Patrick Chea, Phearoun Em, Michael Chin, and Kong Ty—organized and led a marriage-fraud conspiracy. The organizers recruited and paid American citizens to travel to Cambodia and enter into sham marriages with Cambodian citizens. Then, with the organizers' help, the couples would present false documents and statements in support of the Cambodians' applications for permanent-resident status in the United States. In return, Cambodian citizens would pay the organizers up to $25,000. Each of

the defendants here is a Cambodian woman who, with the help of the organizers, married an American man and then entered the United States and sought permanent residency here.

A.

One of the conspiracy's organizers, Vuthea Niev, recruited Larry Hibbard and John Singhiser to travel to Cambodia and enter into sham marriages with Cambodian women. Niev agreed to pay each man over $7000. In September 2002, Niev, Hibbard, and Singhiser flew to Cambodia. After they arrived, Hibbard married Phech Hou Eng, and Singhiser married Sokbay Lim. According to Hibbard's testimony, Eng's boyfriend attended their wedding and was "lovey dovey" with her throughout. Niev told Hibbard that Eng's boyfriend was going to marry an American woman so that he could join Eng in America. Similarly, Singhiser testified that Lim was openly affectionate with another man at their wedding, who Singhiser speculated was her husband.

Four years later, in July 2006, Eng entered the United States using a spousal immigrant visa. Lim followed a month later. Both women listed the same Kentucky address on their Kentucky identification cards. After they arrived in the United States, neither woman ever contacted their American husband again.

B.

Another of the conspiracy's organizers, Phearoun Em, offered Donald Martin $3000 to fly to Cambodia and enter into a sham marriage with Sona Ngov. In December 2004, Em and Martin flew to Cambodia. Martin met Ngov at the airport in Phnom Penh. A photographer took photos of them together before Martin went to his hotel alone. A day or so later, Em arranged a photo shoot with Ngov and Martin by a river. Em also orchestrated a traditional Cambodian

engagement ceremony for them. Martin borrowed a "loaner ring" for the event. Five days after arriving in Cambodia, Martin flew home without getting his fiancé's contact information.

Two years later, Ngov entered the United States using a fianceé visa. Less than three weeks later, on February 24, 2006, Ngov married Martin in Louisville. When Martin tried to kiss Ngov near the end of the ceremony, Ngov turned her head and refused.

Six months after the marriage, the U.S. Citizenship and Immigration Services (USCIS) summoned Ngov and Martin for a marriage interview, a prerequisite for Ngov to become a permanent resident. One of the conspiracy's organizers, Michael Chin, met with the pair before the interview, telling them the questions to expect and how to coordinate their answers. Although Ngov and Martin never lived together, Ngov stayed at Martin's house (along with his live-in girlfriend) the night before the interview. Martin and Ngov then lied throughought the interview and convinced USCIS that their marriage was legitimate. Ngov obtained permanent resident status.

Martin never saw Ngov after the interview and later asked Em (the organizer who had paid him) for a divorce from Ngov. Em thereafter sent divorce papers to Martin and the marriage was dissolved in February 2010.

In April 2010, Homeland Security Agents arrested Ngov at her home. She waived her Miranda rights and told a special agent that her marriage to Martin was a sham. She also said that she had paid Michael Chin $15,000 to arrange her marriage to Martin.

### C.

Another of the conspiracy's organizers, Kong Ty, offered Christopher McAlister $7000 to marry a Cambodian woman, Sokunthy So, later identified as Ty's niece. In November 2005, McAlister and his father flew to Cambodia. When he arrived to the Phnom Penh airport,

McAlister met So and her family. A photographer took photos of them together there. During his ten-day trip, McAlister and So spent every day together, but slept in different rooms. Two days before McAlister flew home, they became engaged in a traditional Cambodian ceremony.

Two years later, in January 2008, McAlister returned to Cambodia to interview with a State department official who doubted the legitimacy of his engagement to So. McAlister lied during the interview and convinced the official to grant a fiancée visa to So. McAlister and So then flew together to the United States. After landing in Louisville, they took a taxi to McAlister's apartment, which he then shared with his girlfriend and their son. McAlister's girlfriend was not happy to see So. Thirty minutes later, Ty's brother, Kob, picked up So.

Two days later, So married McAlister in Louisville. After the ceremony, McAlister, his father, So, and Kob returned to his apartment. McAlister's wife and son were also present. Kob paid McAlister the remaining $4000 for marrying So. Kob and So then left. So never lived with McAlister; instead, she lived in Lexington and worked at her uncle's nail salon. In July of 2009, McAlister broke up with his girlfriend. Soon after, he and So tried to have a legitimate relationship, but it was short-lived.

In December 2009, USCIS scheduled a marriage interview with McAlister and So. Ty coached them for the interview. USCIS Officer Art Schat interviewed only McAlister at that meeting because there were no translators available to interview So. Based upon McAlister's interview, Schat believed the marriage was a sham. He contacted Homeland Security Agent Ron Crawford to investigate whether So lived with McAlister. One week later, Crawford conducted a "bed check" at McAlister's home. So was not there and Crawford found no evidence that a woman lived with McAlister.

Two weeks later, Officer Schat interviewed So. Even though McAlister had given his interview answers to So before her interview, So's answers were "evasive" and "inconsistent." Officer Schat rejected So's application for permanent-resident status.

D.

In 2009, the government indicted 22 people, including the organizers and the appellants, with conspiracy to commit marriage fraud. In total, the government alleged that 58 people (22 defendants and 36 unindicted alleged co-conspirators) participated in a single, massive conspiracy to commit marriage fraud. The government entered plea deals with or dismissed charges with all of the defendants except Lim, Eng, Ngov, and So. A jury thereafter convicted each woman of conspiracy to commit marriage fraud in violation of 18 U.S.C. § 371. The jury also convicted Ngov of marriage fraud in violation of 8 U.S.C. § 1325(c).

These appeals followed.

II.

A.

Sokunthy So argues that the evidence at trial was insufficient to convict her of conspiracy to commit marriage fraud in violation of 18 U.S.C. § 371. Marriage fraud is "knowingly enter[ing] into a marriage for the purpose of evading any provision of the immigration laws[.]" 8 U.S.C. § 1325(c). To establish a conspiracy to commit marriage fraud, the government must prove all of the following: "(1) the existence of an agreement to violate the [marriage fraud statute]; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *See United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). So does not dispute that her American husband—Christopher McAlister—and her uncle—Kong Ty—entered into a conspiracy to commit marriage fraud. Instead, she contends that the

government lacked any proof that she knew about the conspiracy and intended to join it. She contends that McAlister tricked her and the government into thinking that her marriage was real. "It is logically possible that one party to a marriage can commit fraud while the other party genuinely intends to marry." *United States v. Yang*, 603 F.3d 1024, 1026 (8th Cir. 2010). The question here is whether a reasonable jury could reject So's theory and find that she knowingly agreed to enter into a sham marriage based on the government's evidence. *See id.*

We view the evidence in the light most favorable to the government, asking only if any rational jury could have found So guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The government need not prove a formal agreement between the members of a conspiracy; a tacit understanding between them will suffice. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009). And "a conspiracy may be inferred from circumstantial evidence that may reasonably be interpreted as participation in a common plan." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007).

Here, McAlister testified that So met his American girlfriend when she arrived in America—two days before their marriage. Based on this information alone, a reasonable jury could find that So knew that her marriage to McAlister was a sham. Indeed, So's brief concedes as much; but she responds that she first learned about McAlister's girlfriend after she was engaged to McAlister, when she flew to America. This distinction makes no difference: either way, So knew that McAlister lived with his girlfriend and their son before she "enter[ed] into [the] marriage." 8 U.S.C. § 1325(c). Thus, the jury had sufficient evidence to find that So knowingly agreed to commit marriage fraud.

B.

The jury convicted all four women of joining a single, overarching conspiracy that spanned 11 years and included 58 participants. Lim, Ngov, and Eng (but not So) argue that the evidence does not support that verdict.

A variance occurs when the indictment alleges a single large conspiracy, but the evidence at trial can reasonably establish only multiple ones. *United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006). But a variance requires reversal only if it prejudiced the defendant. *Id*. Whether the government has proved one conspiracy, or only multiple ones, is a question of fact considered in the light most favorable to the Government. *United States v. Beals*, 698 F.3d 248, 258 (6th Cir. 2012). We review variance challenges de novo. *Id*.

To establish a conspiracy, the government must prove, among other things, that "each alleged member agreed to participate in what [s]he knew to be a collective venture directed toward a common goal." *Id*. at 258-59. The indictment gave a ballpark definition of the conspiracy's objective: that all of the participants—the organizers, the American men, the Cambodian women—shared the common goal of having Americans marry Cambodians so that the Cambodians could become permanent residents in the United States. And Lim, Ngov, and Eng concede that "the proof at trial demonstrated a . . . conspiracy in which the various defendants entered into separate agreements regarding their own marriages." But they argue that the government lacked any proof that they shared the broad common goal of obtaining entry into the United States for all the other women in the conspiracy.

We agree. There is no evidence that each of the defendants here cared whether other Cambodians became permanent residents in America. Rather, for each defendant, the goal was to become a permanent resident herself. The government responds that each of these women

generally knew, through word of mouth in their Cambodian village, that the marriage-fraud scheme was bigger than just their own sham marriage. But the women's awareness of a larger scheme alone does not prove that each shared a common goal. The government must also prove that they each did "something in furtherance of [the] single, illicit enterprise." *See United States v. Swafford*, 512 F.3d 833, 842 (6th Cir. 2008). And even viewing the evidence in a light most favorable to the government, there is none showing that any of the Cambodian brides acted toward a common goal. *See id*. Thus, there was a variance between the crime the government charged (a single, large conspiracy) and the crime the government proved (multiple ones).

A variance requires reversal "only if a defendant demonstrates that [s]he was prejudiced by [it]." *United States v. Caver*, 470 F.3d 220, 236-37 (6th Cir. 2006). A variance prejudices a defendant if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). Lim, Ngov, and Eng omit any argument, however, that the variance prejudiced them.

Nor could any of the defendants have shown prejudice if they had tried. A variance can prejudice a defendant in several ways. The only relevant risk here would be that Lim, Eng, or Ngov "was convicted based on evidence of a conspiracy in which [they] did not participate." *See Blackwell*, 459 F.3d at 762. Courts refer to this type of prejudice as guilt transference or "spillover." *Swafford*, 512 F.3d at 843. To assess the likelihood of spillover among co-defendants, courts consider the number of co-defendants tried with the defendant, the number of conspiracies shown by the evidence, and the size of the conspiracy alleged in the indictment. *See Blackwell*, 459 F.3d at 762.

There is little reason to think that these factors demonstrate the risk of spillover here. Only four defendants were tried to together. We have held that a variance was not prejudicial

-8-

when the government tried together six. *United States v. Hughes*, 505 F.3d 578, 590 (6th Cir. 2007); *cf. Kotteakos*, 328 U.S. at 752-53 (finding variance prejudicial where 19 defendants were tried together). Thus, "this is not a case where the sheer number of co-defendants resulted in a likelihood of juror confusion or guilt transference." *See Hughes*, 505 F.3d at 590.

Second, the government proved only four conspiracies at trial: Eng's marriage to Hibbard, Lim's marriage to Singhiser, Ngov's marriage to Martin, and So's marriage to McAlister. That is substantially less than the eight conspiracies proved in *Kotteakos*. *See* 328 U.S. at 752-53. And it is unlikely that the jury "transferred guilt from one defendant to the other when such a small number of alleged conspiracies was involved." *See Hughes*, 505 F.3d at 590.

The only factor here that suggests a risk of spillover is the third one. The grand jury charged 22 people with single conspiracy to commit marriage fraud, in addition to 36 unindicted alleged co-conspirators. That is a high number, approaching the indictment in *Kotteakos*, which charged 36 people with participating in a single conspiracy. But the risk of prejudice is reduced when the defendants "were charged with conduct of approximately equal culpability[.]" *See Caver*, 470 F.3d at 237. And the alleged participants—the organizers, the American men, the Cambodian women—were charged with conspiracy to commit the exact same crime here: marriage fraud. On balance, therefore, the variance did not prejudice any of these defendants.

But the defendants contend the variance requires reversal for a different reason: the record, they say, cannot "support a finding of guilt beyond a reasonable doubt" for the single conspiracy charged in the indictment. *Jackson*, 443 U.S. at 319. But we uphold on sufficiency grounds so long as the proof at trial corresponds to an offense set out in the indictment. *United States v. Miller*, 471 U.S. 130, 136 (1985). Here, the government charged a single conspiracy that included, "within the words of the indictment," each woman's separate conspiracy to

commit marriage fraud. *See Berger v. United States,* 295 U.S. 78, 83 (1935). Thus, to prevail on their sufficiency claim, the defendants must make two showings: first, that the government lacked any proof of the single conspiracy; and second, that the government lacked any proof of the "related, similar conspiracy[ies]" of separate marriage fraud. *See United States v. Glenn*, 828 F.2d 855, 858 (1st Cir. 1987). Lim, Eng, and Ngov concede that they cannot make the second showing. Thus, there was sufficient proof to sustain the offense set out in the indictment.

In summary, Lim, Ngov, and Eng failed to show that they were prejudiced by the variance between the single conspiracy charged and the multiple conspiracies proved at trial. The variance, therefore, does not require reversal.

C.

Ngov and Eng complain that the government made an argument at trial that contradicted statements the government had made in pre-trial proceedings involving other co-defendants. Specifically, in the factual-basis section of Vuthea Niev's plea agreements, the government stipulated that Niev was an organizer and leader of an "extensive human trafficking scheme" and that he "recruited [American Men] to participate in the human trafficking scheme[.]" Similarly, Donald Martin's plea agreement said that he "agreed to participate in the human trafficking scheme." Then during the government's direct examination of Officer Schat, it tried to establish that there was no evidence of human-trafficking in this case. Eng objected, citing the government's contradictory position in Niev's and Martin's plea agreements. The district court overruled the objection. Eng and Ngov now argue that the district court committed reversible error when it declined to judicially estop the government from arguing that this case did not involve human-trafficking.

Judicial estoppel is an equitable doctrine that applies when a party attempts to take "a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *Warda v. Comm'r*, 15 F.3d 533, 538 (6th Cir. 1994). The doctrine does not apply when a party's prior position is based on "nothing more than mistake or inadvertence." *Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002); s*ee New Hampshire v. Maine,* 532 U.S. 742, 753 (2001). We review the district court's application of judicial estoppel de novo. *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008).

Here, Eng and Ngov assert that the government advocated a "position" when it used the phrase "human trafficking scheme" three times in the factual-basis sections of Vuthea Niev's and Donald Martin's plea agreements. True, the government did mention human-trafficking in these agreements; but it never advocated the point or otherwise persuaded the district court to adopt it. Judicial estoppel therefore does not apply. *See Zedner v. United States*, 547 U.S. 489, 505 (2006).

D.

Lim and Eng next challenge the district court's exclusion of testimony from their expert witness, Patrick Heuveline, Ph.D, who specializes in Cambodian family structure. Dr. Heuveline would have testified about, among other things, "the history and societal customs and norms of arranged marriages in Cambodia." The defendants argue that Heuveline's testimony was relevant to a central issue at trial: whether Lim and Eng knowingly entered into a marriage for the purposes of evading the immigration laws. The district court disagreed, reasoning that "there is no link between [his] opinions and the Defendant[s'] mens rea." The court also found that, even if his testimony were relevant, "its probative value is slight and . . . substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury."

Lim and Eng now challenge the court's exclusion of Heuveline's testimony, which we review for an abuse of discretion. *United States v. Kalymon*, 541 F.3d 624, 636 (6th Cir. 2008).

We need not reach the merits of Lim and Eng's argument here, because the district court's exclusion of Heuveline's testimony was harmless in any event. *See* Fed. R. Crim. P. 52(a). Heuveline would have testified that arranged marriages were common in Cambodia and that most Cambodian women meet their spouse on their wedding day. But the jury heard about those customs from multiple witnesses—including from USCIS Officer Art Schat and Homeland Security Agent Ron Crawford. Officer Schat testified that "arranged marriages are common in Cambodia. They have been common for centuries, and they are still common to this day." Special Agent Crawford testified that the vast majority of marriages in Cambodia are arranged and that almost half the brides meet their spouse on the day that they get married. One of the organizers, Vuthea Niev, told the jury the same thing. Thus, the jury was aware of Cambodian marriage customs and Heuveline's testimony would have been cumulative. *See Blackwell*, 459 F.3d at 755; *United States v. Seago*, 930 F.2d 482, 494-95 (6th Cir. 1991) (The exclusion of testimony is harmless "where the essence of the desired testimony was introduced" to the jury by other means.)

Moreover, the government's evidence of Lim and Eng's guilt was overwhelming. Hibbard testified that Eng was "lovey dovey" with her boyfriend during her wedding ceremony with Hibbard, that Niev told him that Eng's boyfriend was marrying an American woman so that he could join Eng in America, that Hibbard and Eng never consummated their marriage, and that Eng never spoke to him again after the ceremony.

Similarly, Singhiser testified that Lim was openly affectionate with another man at their wedding, that Singhiser and Lim never consummated their marriage and that they indeed never spoke to each other again.

The district court's exclusion of Heuveline's testimony presents no ground to afford Lim and Eng any relief.

E.

So argues that that the prosecutor committed misconduct when, during his opening statement, he stated that Christopher McAlister "told Sokunthy So that [McAlister] had a girlfriend in the United States" prior to their engagement. Even the government admits that assertion was inaccurate. McAlister never testified that he told So about his girlfriend *before* they became engaged.

To determine whether prosecutorial misconduct requires reversal, we must decide whether the prosecutor's remarks were improper. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011). If they were, we must decide whether the remarks were flagrant using the following four factors: (1) whether the remarks "tended to mislead the jury or prejudice the defendant"; (2) whether remarks were "isolated or extensive"; (3) whether the remarks were "deliberately or accidentally made"; and (4) whether the evidence against the defendant was strong. *Id*.

The government admits that trial testimony established only that So met McAlister's girlfriend before So and McAlister were married—not before their engagement. So argues that this unproven remark during opening requires reversal. Here, the government concedes that the prosecutor's remark during opening statements was improper, but says that the statement was made in good faith and simply mistaken. So does not dispute the prosecutor's good faith, but says that the statement upset her whole defense theory at trial. We have sympathy for her

complaint. But the undisputed fact remains that So came to McAlister's apartment and met his live-in girlfriend two days before So and McAlister were married—which means that So had to know that her marriage was a sham. The evidence against So was therefore very strong, which means that the prosecutor's mistake during opening statements was not flagrant within the meaning of the rule.

So also argues that the prosecutor committed misconduct during his closing argument, when he said there was "all sorts of evidence that she knew about McAlister's girlfriend[.]" But that statement was supported by evidence introduced at trial, and therefore was proper.

F.

Finally, So argues that the government violated her right to confront one of the government's witness, Christopher McAlister. During direct examination of McAlister, the government played a videotape of his 2009 interview with Officer Schat, during which McAlister repeatedly lied. Once the tape was done, the prosecutor asked McAlister why he had lied. So contends that this tactic improperly bolstered McAlister's credibility before she cross-examined him. The argument is meritless: So had a full opportunity to cross-examine McAlister about his testimony, including his explanation of the videotaped interview.

\* \* \*

The district court's judgments are affirmed.